UNITED STATES DISTRICT COURT

OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARCUS BYNUM, et al | |
| Plaintiffs | Civil Action No. 02-956 (RCL) |
| v. | FEE PETITION |
| GOVERNMENT OF THE DISTRICT OF COLUMBIA, | Next Event: Fairness Hearing: January 20, 2006. |
| Defendant | |

TABLE OF CONTENTS

I.   THE SETTLEMENT AND ITS BENEFITS TO THE CLASS .............. 4

II.  ORIGINS OF THE LAWSUIT: A LONG HISTORY OF LATE
     RELEASES AND UNNECESSARY STRIP SEARCHES ................... 8

III. SETTLEMENT SPURRED GENUINE REFORM IN THE
     DEPARTMENT OF CORRECTIONS ................................................. 12

IV.  LITIGATING AGAINST THE DISTRICT ...................................... 15

V.   COMPLEXITY AND DURATION OF THE LITIGATION: A
     PROCEDUAL HISTORY OF THE LAWSUIT .................................. 16

VI.  THE PERCENTAGE-OF-THE-FUND METHOD IS THE PROPER
     METHOD FOR DETERMINING ATTORNEY FEES AWARD IN
     COMMON FUND CASES LIKE THIS ONE ...................................... 22
     1.   Details of the Settlement Agreement. ............................................ 28
     2.   Class Counsel's efforts were solely responsible for generating the
          $12 million Class Fund .................................................................. 34
     3.   Applying the common fund rules to the $12 million Class Fund
          mandates treatment as a common fund.......................................... 35
          a) The Settlement Agreement generates a common fund
             of $12 million attributable to the efforts of Class Counsel. 35
          b) The Settlement Agreement generates a "constructive"
             common fund of $12 million attributable to the efforts of
             Class Counsel .................................................................. 38

VII. CLASS COUNSEL IS ENTITLED TO THE DISTRICT OF
     COLUMBIA CIRCUIT'S BENCHMARK OF 33.3% OF THE
     COMMON FUND ........................................................................... 41
     1.   Standard of Review ...................................................................... 41
     2.   The Thirty-Three and One-Third Percent Figure is well within
          the range of reasonable fees in common fund cases...................... 42
     3.   Other factors weigh in favor of making 33.3% reasonable under
          the circumstances of this case ...................................................... 46
     4.   Litigating Against The District ...................................................... 51
     5.   Lodestar cross-check analysis........................................................ 53

VIII.   CLASS COUNSEL ARE ENTITLED TO REASONABLE
        EXPENSES...…………………………………………………..        58

## FEE PETITION

Class Counsel[1] William Claiborne, Barrett Litt and Lynn Cunningham

hereby move this Court to award them one third (hereafter referred to as

33.3%) of the Class Fund[2] generated by the Bynum Settlement Agreement

(the "Settlement Agreement") as reasonable attorneys' fees for services

rendered in this case, plus reasonable costs.  The Settlement Agreement

provides that the Government of the District of Columbia (the "District" or

the "District of Columbia") shall make a total payment of $12 million

dollars into a Class Fund to settle claims by former inmates of the District of

Columbia Department of Corrections that the Department of Corrections

subjected them to illegal strip searches after they had already been ordered

released by a judge, and held them in custody past their release dates, and to

fund injunctive relief to benefit future class members.  Under the law of this

Circuit, the "percentage of the fund" method is the "proper" method for

awarding fees in a case where a class action case has generated a "fund for

which ... counsel is responsible."  <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d

---

[1] <u>Bynum v. Gov't of the Dist. of Columbia</u>, 384 F. Supp. 2d 342 (D.D.C. 2005) (confirming William Claiborne and Lynn Cunningham as class counsel, and appointing Barrett S. Litt as class counsel).

[2] Capitalized terms in this petition have the meanings assigned them in the Settlement Agreement and the Preliminary Approval Order.

1261, 1265, 1272 (D.C. Cir. 1993)("we conclude that percentage-of-the-fund is the proper method for calculating fees in a common fund case"; "percentage of the fund" applies to that part of the fund which counsel was responsible for generating).  The Settlement Fund is a "fund for which ... [Class C]ounsel is responsible" for generating under Swedish Hosp. Corp., and the 33.3% figure is within the benchmark, and that percentage is reasonable under the circumstances of this case.  See e.g. In re Vitamins Antitrust Litig., 2001 U.S. Dist. LEXIS 25067 (D.D.C. 2001)(applying Swedish Hosp. Corp. "percentage of the fund" principles to "fund for which ... counsel is responsible" for generating).

Class Counsel's efforts were solely responsible for generating the $12 million Class Fund. Unlike the attorneys in Swedish who were piggybacking on the success of plaintiffs in prior litigation, Class Counsel generated the whole fund; Class Counsel faced the risk of zero recovery because they were litigating issues of first impression in this Circuit; Class Counsel were solely responsible for establishing the liability of the District; the District never acquiesced in the treatment of the dispute as a class action; the class members were paupers or low income persons, and thus unable to pay Class Counsel for their time in the very possible event of no recovery; and Class Counsel exhibited extraordinary legal skills in their representation.  Swedish

2

<u>Hospital Corp.</u>, 1 F.3d at 1265-1266 (factors considered by Court in assessing attorneys' contribution to the fund).

Additionally, the settlement was not the result of collusion. The parties took over a year to negotiate the settlement; the settlement was negotiated under the auspices of the United States District Court Mediation Program administered by the Office of the Circuit Executive for the United States Courts for the District of Columbia Circuit, pursuant to LCvR 84, with the aid of and under the supervision of two mediators appointed by the Office of the Circuit Executive. As ¶7 of the preliminary approval order states:

> The settlement of this Lawsuit was not the product of collusion between Plaintiffs and Defendant or their respective counsel, but rather was the result of bona fide and arm's-length negotiation conducted in good faith by the Parties and their counsel through the United States District Court Mediation Program administered by the Office of the Circuit Executive for the United States Courts for the District of Columbia Circuit, pursuant to LCvR 84. The Settlement Agreement and the settlement set forth therein are hereby approved and found to be fair, adequate, reasonable, in the best interest of the Class as a whole, and in satisfaction of *Rule 23 of the Federal Rules of Civil Procedure* and due process requirements.
> <u>Bynum</u>, 384 F. Supp. 2d 342, at *61.

The mediation process protected the class from any potential conflict between Class Counsel and the class arising from the fee negotiations.

Moreover, this is not a case where counsel settled before trial to increase their fee.  The parties did not settle this case until virtually the eve of trial.  Both sides had submitted pre-trial reports, and the Court had set a trial date for all practical purposes.  Moreover, under the terms of the Settlement Agreement, Class Counsel were obligated to litigate separately the issue of the legality of the strip searches for injunctive relief.  A separate trial of this issue was avoided only when the District agreed to change its practice of returning to the DC Jail for processing (and strip searches) in-custody defendants who get release orders at their court hearings.

## I.      THE SETTLEMENT AND ITS BENEFITS TO THE CLASS

The Settlement Agreement marks a major milestone in civil rights litigation involving the District of Columbia Department of Corrections. The Settlement Agreement provides for a total payment of $12 million by the Government of the District of Columbia into a Class Fund to settle claims by former inmates of the District of Columbia Department of Corrections that the Department of Corrections subjected them to illegal strip searches after they had already been ordered released by a judge, and held them in custody past their release dates, and to fund injunctive relief to benefit future class members.  Thus, the Settlement Agreement provides

direct monetary payments to thousands of former inmates, funds[3] purchases

of new equipment and improvements to the physical plant of the DC Jail that

will benefit thousands of future inmates by eliminating or minimizing

overdetentions, and makes other improvements in the inmate management

system.  Finally, the Settlement Agreement eliminates the previous

Department of Corrections policy of strip searching in-custody defendants

entitled to release after their court appearances.

This settlement was reported by News Channel 8 as the largest

settlement ever paid by the Department of Corrections.  An informal survey

of local counsel has not revealed a larger settlement or verdict paid by the

District of Columbia.  Counsel for the District of Columbia confirm that this

settlement is the largest known settlement involving the District of

Columbia. Before this case, the largest known previous settlement involving

the Department of Corrections in a civil rights case was the $8 million

settlement paid by the District in 1999 in the Bessye Neal case.

Memorandum Opinion, <u>Neal v. Department of Corrections</u>, 93-cv-02420

---

[3] The District has proposed allocating the entire $3 million on the design and
building of an Inmate Processing Center at the D.C. Jail to provide adequate
processing facilities for intakes and releases, and associated records
processing.  The District estimated that the Center will cost a total of $5
million.  The District is willing to commit to funding the remaining $2
million needed to complete the project.

(RCL) June 28, 1999; <u>D.C. Sexual Harassment Lawsuit Settled</u>, Bill Miller,

Metro, P. B05; June 29, 1999.

The Settlement Agreement provides for a total payment of $12 million

by the District into a Class Fund to settle claims by former inmates of the

Department of Corrections that the Department subjected them to illegal

strip searches after they had already been ordered released by a judge, and

held them in custody past their release dates, and to fund injunctive relief to

benefit future class members.  The $12 million Class Fund breaks down into

3 components:  (1) $5 million for distribution to claimants[4]; (2) $4 million

for payment of attorneys' fees, subject to approval of the court; and (3) $3

million to benefit future class members, a sum which the D.C. Department

of Corrections must use to fund the injunctive relief changes necessary to

eliminate the over-detentions and strips searches that are the subject of this

lawsuit.

---

[4] The Settlement Agreement requires that all of the $5 million (minus
expenses) be distributed to class members who file claims, based on a point
system set forth in the proposed final order (Exhibit E to the Settlement
Agreement).  None of this sum reverts to the District.  Attorneys' fees in the
case constitute a separate fund.  Should the Court award less than the full
amount of the $4 million to the attorneys, the remainder reverts to the
District as part of the reversionary injunctive relief fund for jail
improvement, for the benefit of future class members.  Settlement
Agreement page 13, Section III, A, ¶5.

The $3 million "reversionary fund" is new money (not money already in a previously approved budget) earmarked for funding the injunctive relief component of the settlement to fund the injunctive relief changes necessary to eliminate the over-detentions and strips searches that are the subject of this lawsuit.  The agreement also obligates the District to use the money to make improvements to the physical plant of the DC Jail and to purchase and to install state of the art electronic system for tracking and processing inmates to prevent future overdetentions.  The District has proposed allocating the entire $3 million on the design and building of an Inmate Processing Center at the D.C. Jail to provide adequate processing facilities for intakes and releases, and associated records processing, that the District estimates will cost a total of $5 million.  The District is willing to commit to funding the remaining $2 million needed to complete the project.  Thus, funds that were not available and would not have been spent on these improvements have been earmarked for this purpose as a direct result of the settlement.

Additionally, as part of the Settlement Agreement, the District agreed to change its policy of returning in-custody defendants entitled to release to the DC Jail for out-processing (where they were strip searched **after** a judge had ordered their release).  For years, an acquittal of an in-custody defendant

in the District of Columbia courts resulted not in a joyful reunion with

family members and an immediate return to freedom, but a ride in shackles

back to the jail, a degrading and humiliating strip search, and days or weeks

or months of further confinement, anxiety of family members, and

frustrating calls to the Records Office seeking the release of a person whom

a judge had already ordered released.  As a result of the Settlement

Agreement, the District now diverts in-custody defendants who go to court

and receive a release order to an off site facility where they are held while

the Department of Corrections processes their releases in order to obviate the

need for returning potential releasees to the DC Jail where they, along with

all prisoners entering the jail, would be strip searched.  The Chief Judge of

the District of Columbia Superior Court's order (entered after plaintiffs filed

this lawsuit) mandating that in-custody defendants remain in the courtroom

until their release or commitment orders have been issued means that release

orders stay with the prisoner, thus eliminating delays and mistakes due to

lost paperwork.  The Settlement Agreement does not assign a money value

to this component of the settlement, and so Class Counsel are not asking for

a fee from the value of this component of the settlement.

## II.    ORIGINS OF THE LAWSUIT: A LONG HISTORY OF LATE RELEASES AND UNNECESSARY STRIP SEARCHES

The Department of Corrections had a long history of holding inmates past their court ordered release dates.  The most spectacular case of overdetention was the case of Joseph Heard, a deaf mute man held at the DC Jail for two years after a judge ordered his release.  Heard v. District of Columbia, 02-296 (CKK) (complaint alleges Mr. Heard held in solitary confinement for 670 days after a judge dismissed his case and ordered his release).  However, thousands of other inmates were held for days, weeks and even months after their cases were dismissed, a judge granted them PR, their sentences expired, or even after a jury or a judge had acquitted them in a trial.

The District of Columbia government had known of problems in the Records Office at the DC Jail since the late 70s. (In addition to overdetention problems, there had also been problems of early releases of people, sometimes dangerous, not entitled to release, of whom Oscar Veal was the most notorious.) Various agencies, state, federal and independent, and even this Court, had commissioned a series of reports detailing the problems in the Records Office and the Department of Corrections' inmate management system including studies dating back as far as 1976.  The studies mentioned and some of their principal recommendations were as follows:

- <u>1976 RMC Research Corporation Analysis</u>.  Major Recommendations: reorganization of the Records Office and increased staffing in the office.

- <u>1985 BOP Evaluation</u>.  Major Recommendations: creation of a headquarters level position at the Department of Corrections to provide guidance and written policy to the Records Office; increased Records Office staff; and restricted access to the Records Office and files.

- <u>1986 DOC Security Workgroup Study</u>.  Major Recommendations: creation of a system of judgment and commitment files separate from central inmate files; restricted access to the Records Office and institutional files.

- <u>1989 NIC Study</u>.  Major Recommendations: creation of a new records coordinator position with the person being given technical responsibility for the Records Office; standardization and organization of Records Office files; development of a staff training program; development of written policies and procedures; increased Records Office staffing.

- <u>1997 BOP Re-Evaluation</u>.  Major Recommendations: establish a Records Administrator who reports to the Deputy Director (also recommended in 1985); establish an Inmate Training Officer; creation of a sentence computation manual; creation of a Records Office manual detailing policies and procedures.

- <u>1999 Wright Report</u>.  On October 5, 1999, John L. Clark, Corrections Trustee for the District of Columbia, prepared a Report to the United States Attorney General entitled, "Review of the Handling of Leo Gonzales Wright and Similar Offenders Sentenced by the U.S. District Court for the District of Columbia" (the "Wright Report").

- <u>Shaw Report</u>.  On July 28, 2000, in response to U.S. District Court Judge Royce Lamberth's April 12, 2000 Order to Show Cause, independent consultant John R Shaw prepared a Report and Recommendation concerning the erroneous release of Oscar Veal Jr. (the "Shaw Report").  The Shaw Report reviewed the jail's operations and concluded that the records office "is in shambles" and unable to adequately keep track of the roughly 1,700 prisoners in custody on any given day.

Moreover, the Records Office, in addition to suffering from the technical problems detailed in these studies, was also a dumping ground for non-performing workers, and at times a personal fiefdom for notorious sexual predators.  In March 21, 1994, after a four-day trial in this Court, a jury found that the then head of the Records Office, Edward Paylor, subjected a female employee of the Records Office to such persistent and abusive sexual harassment that he drove her to a nervous breakdown.  <u>Webb v. Hyman</u>, 861 F. Supp. 1094, 1103 (D.D.C. 1994).  Attractive women who worked in the Records Office under Paylor and who exchanged sexual favors for better working conditions were known as "Paylorettes."  <u>Id</u>.  <u>See generally</u> Memorandum Opinion, <u>Neal v. Department of Corrections</u>, 93-cv-02420 (RCL) June 28, 1999 (summarizing environment of sexual misconduct prevailing in Department of Corrections).

Despite the notoriety, and despite the numerous reports detailing problems in the Records Office and outlining recommendations, before this class action lawsuit, little was done to stop the overdetentions and early

releases until this Court's show cause in the Oscar Veal erroneous release

case.  United States v. Veal (In re the erroneous release of Oscar Veal), 00-

ms-149 (RCL).

## III.   SETTLEMENT SPURRED GENUINE REFORM IN THE DEPARTMENT OF CORRECTIONS

In a larger sense, beyond the benefits for past and future class

members, the Bynum lawsuit has served either as the impetus for genuine

reform in the Department of Corrections, or greatly spurred the pace of

previously contemplated reform in the Department, in the inmate

management system, the Records Office, the Receiving and Discharge area,

the transportation of in-custody defendants to and from court appearances,

and other areas connected to ensuring the release of inmates on their court

ordered release dates, and eliminating what plaintiffs contended were illegal

and unnecessary strip searches.

Additionally, by forcing genuine reform in the Records Office, the

Receiving and Discharge area, and the entire inmate management system,

this lawsuit induced the District to focus on and remedy both sides of the

erroneous release problem: overdetentions, releasing persons after their court

ordered release date, and also premature releases, releasing inmates before

their lawfully imposed sentences or periods of confinement had expired.  As

plaintiffs pointed out on page 10 of their memorandum of law in support of

their first motion to certify (docket # 6), "Overdetentions and erroneous releases are flip sides of the same coin.  Fixing one problem properly will solve the other."

Even though the Department of Corrections had begun implementing JACCS, a new computer system for tracking inmates and their release dates, in late 2000, before the lawsuit was filed, many other changes occurred only after plaintiffs filed their lawsuit in May, 2002.

For example, on July 25, 2002, Chief Judge Rufus King of the District of Columbia Superior Court issued (and more importantly, began enforcing) an administrative order requiring that as of August, 5, 2002 all in-custody defendants remain in the courtroom until the judge issued their orders. Superior Court of the District of Columbia, Administrative Order No. 02-22, issued July 25, 2002.  This order resolved the problem[5] of inmates returning to the DC Jail and being put into the jail without commitment papers (beyond the Marshals' transport manifest).

_____

[5] Prior to the issuance of the Chief Judge's order, it was common for a defendant and his paperwork to become separated, and for the defendant to be taken from a courtroom before the judge in that courtroom had signed off on his paperwork, and for the defendant to be transported back to the DC Jail and booked in on a Marshal's transport sheet with some or all of the paperwork arriving at the DC Jail later in the day or evening, or, in some cases, not arriving at all.

The Department of Corrections appointed Steve Smith to take charge of the Records Office and implement changes in August, 2002.  Mr. Smith assembled a staff, implemented new procedures, and greatly reduced the erroneous releases (both premature releases and overdetentions) that had plagued the Department.

Moreover, remedying the problems in the Records Office made possible the elimination of the policy of strip searching in-custody defendants entitled to release by virtue of their court appearances. Previously, because the Records Office lost track of in-custody defendants sent to court for hearings, and the Records Office could not provide reliable release information to the US Marshals' Service (the agency that had custody of in-custody defendants while at the courthouses) for courthouse releases, in 1999 the Department of Corrections implemented a policy of returning in-custody defendants to the DC Jail for release instead of releasing them directly from the courthouses.  Since all prisoners entering the DC Jail and CTF were strip searched, this policy resulted in all in-custody defendants who were ordered released at court getting strip searched, even those acquitted after trial.  Even when changes began in the Records Office, the strip searches continued unabated, until the settlement in this case.

Additionally, given that the cost of housing an inmate in the DC Jail or CTF costs approximately $90 per night, remedying the overdetention problem will also save the taxpayers much needed money.

## IV.   LITIGATING AGAINST THE DISTRICT

A significant fact in evaluating the reasonableness of plaintiffs' proposed fee award is that until plaintiffs filed their lawsuit in May 2002, no other individual, law firm or public interest group had filed a lawsuit challenging the overdetentions and strip searches stemming from the Records Office problems.  In fact, during the period in question, only 4 outside agents were working informally to help secure the release of overdetained inmates from Department of Corrections' custody: the Office of the Chief Judge of the District of Columbia, the District of Columbia Superior Court Public Defender's Office, D.C. Prisoners' Legal Services Project, and, last but not least, the court appointed lawyers[6] representing indigent defendants in the Superior Court.  Plaintiffs' case was the first

---

[6] Class Counsel Claiborne is well acquainted with many members of the criminal defense bar practicing in the District of Columbia Superior Court, and almost every one has a horror story to tell about trying to prod the Records Office to release an inmate whom a judge has ordered released. The members of the criminal defense bar practicing in the District of Columbia Superior Court, assisted by the Chief Judge's Office, for many years have been the first, and in many cases the only, "go to" resource for family members and loved ones trying to secure the release of overdetained inmates.

lawsuit filed seeking class wide damages for overdetentions and strip searches.

One explanation for this is the well known difficulties of litigating against the District.  As it turned out, the District did not employ in this case the tactics that it employed in the <u>Neal</u> case and other similar cases. However, seen from the perspective of Class Counsel and other lawyers in 2002 and in previous years, before the filing of the lawsuit, the litigation tactics of the Department of Corrections in the <u>Neal</u> case served as a warning -- and as a deterrent -- to lawyers contemplating bringing damage suits against the Department of Corrections.  <u>See</u> <u>Neal v. Director, D.C. Dep't of Corrections</u>, 1996 U.S. Dist. LEXIS 8874 (D.D.C. 1996)(summarizing problems District of Columbia caused in litigating case).

## V.   COMPLEXITY AND DURATION OF THE LITIGATION: A PROCEDUAL HISTORY OF THE LAWSUIT

The Settlement Agreement was the culmination of over 4 years of effort, 2 years of intense litigation, and almost two years[7] of equally intensive mediation.  Although the parties ultimately decided to mediate the case, and to work together to come up with a fair and far reaching

---

[7] The Court referred the case for mediation on May 5, 2004 (docket # 114). The parties advised the Court of a settlement in principle at a hearing on May 13, 2005.

settlement, at the beginning, the District fiercely litigated practically every issue, as evidenced by the multiple motions and depositions prior to settlement.  Moreover, Class Counsel expended many hours during the mediation period preparing for the mediation, preparing dispositive motions, and preparing for trial.

Plaintiffs filed their original complaint on May 16, 2002.  Plaintiffs ultimately filed three more complaints, ending with the Third Amended Complaint. Plaintiffs filed their motion to certify an overdetention class and a strip search class on July 26, 2002.  (docket # 6) and a motion for preliminary injunction on August 23, 2002 (docket # 10).

The District moved to dismiss the strip search component of the case, moved for summary judgment on the strip search component of the case before the Court had even entered a scheduling order, opposed the motion for preliminary injunction, opposed the motions to certify, opposed the motion to file the Third Amended Complaint amending the Strip Search Class definition, and opposed the second motion to certify the Strip Search Class.  Additionally, the District resisted discovery and litigated practically every one of plaintiffs' attempts to schedule depositions and propound document production requests and interrogatories.  Plaintiffs were not able

to secure a deposition witness until February, 2003, almost nine months after

the original complaint was filed.

Defendant also litigated practically every issue within every motion.

After this Court denied plaintiffs' motion to certify a Strip Search Class on

numerosity grounds, plaintiffs attempted to gain the District's consent to the

numerosity issue, but was unable to do so.  Discovery responses and

deposition testimony to that time had produced the single name of Elonia

Robinson employee in response to plaintiffs' queries about the name of the

Department of Corrections stationed in the Superior Court to process the

release of court returns entitled to release, and who would have information

about the number of in-custody defendants who received release orders at

Superior Court each day.  The District stated that it could not give her

contact information.  However, plaintiffs checked the Superior Court civil

docket, located the case file in Watkins[8] v. District of Columbia, searched

the case file, and discovered that another Department of Corrections

employee, Tony Savage, had worked both in the Records Office as a legal

_____

[8] In 2004, a District of Columbia Superior Court grand jury awarded Mr.
Watkins back pay, reinstatement and approximately $30,000 in damages,
essentially accepting as true his claim that the District of Columbia
Department of Corrections had fired him in 2002 for blowing the whistle on
the overdetention problem and other Records Office problems to Superior
Court Chief Judge Rufus King and others.  Watkins v. District of Columbia,
02-ca-8150.

instruments examiner and also at the Superior Court as the run-down.

Plaintiffs located him in Woodbridge, VA, obtained an affidavit on

numerosity from him, and used it to support their motion to certify the Strip

Search Class.  Plaintiffs also had to wait outside the DC Jail at "release

time" to obtain affidavits from in-custody defendants who had been ordered

released from Department of Corrections' custody at their court hearings,

but sent back to the DC Jail for processing and strip searched after a judge

had ordered their release.

The District also filed an opposition to the plaintiffs' motion to certify

the Strip Search Class, challenging plaintiffs' contention that the Department

of Corrections database and the Superior Court could be used to identify

class members and their lengths of overdetention, or those entitled to release

and subject to the District's strip search policy (both of which plaintiffs

ultimately were able to accomplish once they received the data).  Plaintiff

had to obtain an affidavit on this point from their computer expert.

Although the District's opposition to the motion to certify cited opposing

affidavits, the District ultimately never produced them.

In order to obtain the JACCS database, the key to cracking the case,

plaintiffs had to file a motion to compel, a second motion to compel (to

which the District never responded) and finally a motion to take as conceded the second motion to compel.

Only after plaintiffs got the class certified, prevailed on the motion to dismiss and the motion for summary judgment based on the strip search issues, gained approval of its trial plan, and obtained the District's computer databases, did the District began to negotiate the case.

Plaintiffs also took numerous depositions and interviewed and obtained affidavits from numerous witnesses.  Class Counsel Claiborne conducted 16 depositions in this case, and also conducted 3 depositions in a related case that produced valuable material on the Receiving and Discharge area, the strip search procedure, and the release process.  Class Counsel also conducted numerous interviews with former inmates, many late at night at the DC Jail with inmates as they were leaving the jail, and combed court jackets to locate former employees and to interview them.  Finally, Class Counsel identified and tracked other litigation pending against the Department of Corrections and purchased or otherwise obtained depositions in those cases.   A partial list of the depositions plaintiffs conducted, purchased or otherwise obtained is attached as Plaintiffs' Exhibit.

Class Counsel Claiborne and Cunningham testified before the District of Columbia City Council about this case and the problems in the Records Office on November 13, 2002.

Even after the parties entered mediation Class Counsel still had to spend prodigious amounts of time on the case.  For example, Class Counsel and their computer expert had to spend hundreds of hours analyzing the Department of Corrections' computerized data base and the Superior Court computerized case docketing system to identify class members and their periods of overdetention, especially in preparation for the mediation sessions.  From June 8, 2004, when class counsel received the Department of Corrections JACCS data from the District and passed it onto their expert, up until the date the case settled, May 27, 2005, teleconferences alone between the computer expert, and Class Counsel William Claiborne (who had primary responsibility for working with the computer expert) totaled 79.5 hours.  Plaintiffs' computer expert also traveled to Washington, DC to meet with Class Counsel Claiborne and District of Columbia computer experts during the long weekend of February 18 to February 23, 2005, and Class Counsel Claiborne spent over 50 hours working with the expert and District staff during that period alone.

Class Counsel also spent many hours in the Spring of 2005 meeting with agencies involved in the District of Columbia criminal justice system to develop a plan for processing the release of in-custody defendants who received releases at the courthouses in a way that did not require their being returned to the DC Jail and strip searched as part of the processing.  Class Counsel met with independent agencies like the Public Defender Service and the D.C. Prisoners' Legal Services Project, and with agencies like the United States Marshals' Service; drafted a proposal based on the court release procedure developed as part of the <u>Williams</u> Settlement for use in LA County, and circulated their proposal for comment among the agencies listed above, and the Department of Corrections, via opposing counsel.

Additionally, plaintiffs had to continue collecting depositions, interviewing witnesses, and retaining experts for use in preparing dispositive motions during the mediation period.  Plaintiffs expected to have to litigate the strip search issue even after the parties settled the case, as part of the initial settlement agreement.  Moreover, during the last few months of the mediation period, plaintiffs were gearing up for trial.

**VI.   THE PERCENTAGE-OF-THE-FUND METHOD IS THE PROPER METHOD FOR DETERMINING ATTORNEY FEES AWARD IN COMMON FUND CASES LIKE THIS ONE**

The percentage-of-the-fund method is the proper method[9] for

determining attorney fees awards in common fund[10] cases like this one.

_____

[9] The mere fact that plaintiffs originally brought this case under a statute with a fee shifting provision does not preclude application of the common fund doctrine.  See Brytus v. Spang & Co., 203 F.3d 238, 246-247 (3d Cir. 2000) (holding that common fund funds can be appropriate in both settled and litigated cases where statutory fees are available); Cook v. Niedert, 142 F.3d 1004 (7th Cir. 1998) (approving fees measured by common fund rather than statutory principles where statutory fees were available); Florin v. Nationsbank, 34 F.3d 560, 564 (7th Cir. 1994) (common fund principles "properly control a case which is initiated under a statute with a fee shifting provision, but is settled with the creation of a common fund."); Staton v. Boeing Co., 327 F.3d 938, 967 (9th Cir. 2003).  Nothing in either the plain language of § 1988 or Swedish Hospital Corp. precludes application of the common fund doctrine in a case initially brought under a statute with a fee shifting provision.

[10] The Eleventh Circuit also mandates use of the percentage method in common fund cases.  Camden I Condominium Association, Inc v Dunkle, 946 F2d 768, 774 (11th Cir 1991) ("We believe that the percentage of the fund approach is the better reasoned in a common fund case.")  The other Circuits that have considered the question of whether to apply the percentage-of-the-fund method or the lodestar have left the choice to the discretion of the district courts, but several of these incline toward the percentage approach.  For example, the Tenth Circuit has held that "either method is permissible," but there is a "preference for the percentage of the fund method." Gottlieb v Barry, 43 F3d 474, 483 (10th Cir 1994).  And in circuits that leave discretion to the district courts, the district courts employ the percentage method more frequently than the lodestar. See Brytus v Spang & Co., 203 F3d 238, 243 (3d Cir 2000) (stating "attorney's fees under the common fund doctrine may be calculated using the lodestar method but more frequently such fees have been awarded using the percentage-of-recovery method").  In 1985 the Third Circuit appointed a task force of distinguished practitioners, judges and academics who produced a report, *Court Awarded Attorney Fees: Report of the Third Circuit Task Force* ("*1985 Task Force Report*"), which recommended that the lodestar approach be restricted to statutory fee shifting cases, and endorsed the "reasonable

Swedish Hosp. Corp., 1 F.3d at 1271 (apply "percentage of the fund" to that part of the fund for which counsel was responsible).

The Court of Appeals decision in Swedish Hospital is based on Supreme Court cases such as Boeing Co. v. Van Gemert[11], 444 U.S. 472 (1980), in which the Court approved a fee award based on the percentage-of-the-fund method in a common fund case, which in turn are based on a long line of cases holding that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.  See e.g. Central R.R. & Banking v. Pettus, 113 U.S. 116, 128 (1885)(denying the attorneys a supplemental award would have left the class members unjustly enriched at the attorneys' expense, in violation of the equitable principle that persons who are unjustly enriched must make restitution).

The Swedish Hospital Court preferred the percentage-of-the-fund method over lodestar in the common fund context because (1) there is often

---

percentage of the fund" method in common fund cases.  Newburg also recommends the use of the percentage-of-the-fund method in common fund cases.  Newberg, Attorney Fee Awards § 1.10, at 17 (1986) (emphasis added; footnotes omitted), cited in Swedish Hosp. Corp., 1 F.3d at 1268.

[11] The Swedish Hospital Court noted that the footnote in Blum v. Stenson, 465 U.S. 886 (1984) makes it plain that that decision's approval of the lodestar method in the fee-shifting context was not intended to overrule prior common fund cases, such as Boeing.  Swedish Hosp., 1 F.3d at 1268.

no resulting fund in fee-shifting cases, and (2) in the Court's view, more importantly, using the lodestar approach in common fund cases encourages significant elements of inefficiency.  Swedish Hosp. Corp., 1 F.3d at 1268.

The Swedish Hosp. Court explained the percentage-of-the-fund method was more efficient than the lodestar approach in common fund cases because: when a defendant settles by paying a lump sum into a fund, "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it influence the fee award;" 1 F.3d at 1269; a percentage-of-the-fund approach more accurately reflects the economics of litigation practice, 1 F.3d at 1269; the percentage-of-the-fund approach is less demanding of scarce judicial resources than the lodestar method, Id.; it prevents a request for attorney's fees from resulting in a second major litigation, 1 F.3d at 1270; a percentage-of-the-fund approach is less subjective than the lodestar approach, because the court need not second-guess the judgment of counsel as to whether a task was reasonably undertaken or hours devoted to it reasonably expended, Id.

The Swedish Hosp. Court noted the following inefficiencies in the lodestar method, especially in the in the common fund case context: (1) attorneys are given incentive to spend as many hours as possible, billable to

a firm's most expensive attorneys, (2) there is a strong incentive[12] against early settlement since attorneys will earn more the longer a litigation lasts; and (3) reviewing and litigating lodestar based applications causes substantial delay in distribution of the common fund to the class (because distributions cannot be made until after the lodestar determination is made). Swedish Hosp. Corp., 1 F.3d at 1270.

The Swedish Hosp. Court took a liberal approach to the application of the common fund doctrine, mandating its use in basically every class action case where the named plaintiffs' attorneys generated an amount of money for distribution to class members, or for the benefit of absent class members.  Swedish Hosp. Corp., 1 F.3d at 1268.  For example, the Court quoted with approval a passage from Newburg where he speaks of a common fund as "any monetary recovery for the named plaintiffs or for a class."  Swedish Hosp. Corp., 1 F.3d at 1268.

Basically, Swedish Hosp. Corp. holds that the percentage-of-the-fund method should be applied (1) whenever there is a monetary fund to apply it to, and (2) persons other than the named plaintiffs will benefit from the fund.

---

[12] In the percentage of the fund context, working additional hours beyond those efficiently allocated to the case, and continuing to bill past the settlement point, serve only to reduce attorneys' hourly rates.

The Court of Appeals recently approved <u>Swedish Hosp. Corp.</u>'s liberal approach to applying the common fund doctrine, when it approved the district court's taking "great pains to account for any benefit that the services of petitioners' attorneys may have conferred on the Riders' Fund and award[ing] these attorneys a reasonable percentage of the funds produced through their efforts." <u>Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n</u>, 38 F.3d 603, 608 (D.C. Cir. 1994).

District courts in this Circuit have also liberally applied the principles of <u>Swedish Hosp. Corp.</u> so that, in the class action context, the term "common fund" is broadly construed to include a monetary fund generated by a class action settlement agreement. <u>In re Vitamins Antitrust Litig.</u>, 2001 U.S. Dist. LEXIS 25067, *40-*41, <u>citing</u> <u>Johnston v. Comerica Mortg. Corp.</u>, 83 F.3d 241, 246 (8th Cir. 1996). These cases treat all monetary amounts paid by a defendant as part of a package deal to settle a class action as a common fund, even if the parties have to some extent allocated the distribution of the proceeds of the fund between the class and the class counsel. Id. For example, the court in <u>In re Vitamins Antitrust Litig.</u>, 2001 U.S. Dist. LEXIS 25067, 40-41 added a payment of attorneys' fees by defendant to class counsel to the fund available for distribution to the class, and treated the combined amounts as a "constructive" common fund, and

applied the percentage to that "constructive" common fund in awarding

counsels fees and assessing their reasonableness.  See e.g. In re Vitamins

Antitrust Litig., 2001 U.S. Dist. LEXIS 25067, 36 (D.D.C.

2001)(percentage-of-the-fund method applies to any case where class

counsel generate a fund for distribution to a class, and the amount of the

fund is "readily calculable;" discussing creation of a constructive common

fund[13]); In re Baan Co. Secs. Litig., 288 F. Supp. 2d 14, 21 (D.D.C. 2003);

Advocate Health Care v. Mylan Labs. Inc. (In re Lorazepam & Clorazepate

Anittrust Litig.), 2003 U.S. Dist. LEXIS 12344 (D.D.C. 2003); In re Baan

Co. Secs. Litig., 288 F. Supp. 2d 14, 19 (D.D.C. 2003); In re First Databank

Antitrust Litig., 209 F. Supp. 2d 96, 101 (D.D.C. 2002).

### 1.    *Details of the Settlement Agreement.*

The Settlement Agreement provides for a total payment of $12 million

dollars by the Government of the District of Columbia (the "District" or the

"District of Columbia") into a Class Fund to settle claims by former inmates

of the District of Columbia Department of Corrections that the Department

---

[13] In re Vitamins Antitrust Litig., 2001 U.S. Dist. LEXIS 25067, 36 (D.D.C. 2001) defines a "constructive common fund" as a fund generated by a class action settlement agreement treated as a common fund for purposes of both (1) determining whether to use the "percentage of the fund" method of computing a reasonable attorneys' fee (as opposed to the "lodestar" method); and also (2) determining the total value of the settlement to which the percentage is applied in computing a fee.

of Corrections subjected them to illegal strip searches after they had already been ordered released by a judge, and held them in custody past their release dates, and to fund injunctive relief to benefit future class members.  The $12 million Class Fund breaks down into 3 components:  (1) $5 million for distribution to claimants; (2) $4 million for payment of attorneys' fees, subject to court[14] approval; and (3) $3 million to benefit future class members, which the Department of Corrections must use to fund the injunctive relief changes necessary to eliminate the over-detentions and strips searches that are the subject of this lawsuit.

The Settlement Agreement obligates the parties to negotiate the specific items on which the District must spend the $3 million to fund the injunctive relief changes necessary to eliminate the over-detentions and strips searches that are the subject of this lawsuit.  The District has proposed allocating the entire $3 million on the design and building of an Inmate Processing Center at the D.C. Jail to provide adequate processing facilities for intakes and releases, and associated records processing.  The District

---

[14] In common fund cases, it is not the creation of the fund itself that entitles the attorneys to be paid from the fund. Rather, any obligation that the fund incurs to pay attorneys' fees must result from the exercise of the court's inherent equitable power to assess fees against those who stand to ultimately benefit from the fund.  Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n, 309 U.S. App. D.C. 28 (D.C. Cir. 1994)

estimated that the Center will cost a total of $5 million.  The District is

willing to commit to funding the remaining $2 million needed to complete

the project.  Class Counsel support the District's proposal, and ask the Court

to approve the District's proposal.  The parties will submit a copy of the

finalized proposal to the Court for inclusion in the final approval order.

Attached is a copy of the District's proposal letter.

 The Department of Corrections (DOC) proposes to use the $3 million

in settlement money to build a state of the art  Inmate Processing Center

(IPC) within the foot print of the DC Jail site. The additional $2 million

required to complete the $5 million project will be provided by District

government.

 The purpose of the Inmate Processing Center will be to provide

adequate processing facilities for intakes and releases, and associated

records processing.  The IPC will:

- Include required processing space, stations, and protocols
  for new system intakes, inmates returning from court
  hearings with legal matters pending, inmates returning from
  court post sentencing, and inmates returning from court with
  dismissed charges and no legal matters pending.  The
  processing stations will be set up in a logical flow allowing
  for booking the inmate, collection of property and funds,
  required searches, risk assessment and classification,
  generation of photographs and id wristbands, distribution of
  clothing, establishment of required accounts, orientation,
  and dissemination of rules and regulations.  Court ordered
  releases will be separated from inmates to be held in
  custody.  The Center could potentially provide for pre-
  release counseling stations as well, offering job, education

and referrals to community and governmental resources. The Center's capacity will be sufficient to adjust operational work stations to match changing demand patterns. DOC's goal is to create a processing environment that is more humane and business-like in appearance.

- Incorporate "B.O.S.S. chairs" and other non-invasive detection technologies in the process flow with the goal of minimizing physical contact and providing for clothed body searches, except where evidence warrants a search. The focus would be on detecting metals, explosives, drugs and other contraband.

- Utilize technology aided inmate property management whereby inmates' property will be digitally photographed prior to storage, and inmates will be given a receipt for property retrieval upon release.

- Contain space for inmate records processing so this function is seamlessly integrated with the new Inmate Processing Center.

- Take advantage of positive id technology at system intake and release points to verify the identity of individuals prior to intake and release.

Existing staff and computer equipment will be re-located to the IPC. DOC expects the IPC to yield substantial operational benefits as a result of the co-location of interdependent intake/release functions and the logical process flow layout of the Center. In an effort to strengthen IPC operations still further, DOC is requesting capital funds in FY 07 to install a wireless LAN at the DC Jail and an RFID system. The latter system will allow DOC to track inmate movements

and locations electronically, conduct real-time counts, and assure

positive identification.

The District is willing to commit to funding the remaining $2 million

of the total of $5 million needed to complete the project.

Thus, this "reversion fund" directly benefits future class members,

clearly distinguishing it from reversions of unclaimed funds that return free

and clear to the defendant's general coffers.  Here, the $3 million is more

like a cy pres fund for the benefit of absent class members who cannot be

located or who do not or cannot submit claims, than a reversion that returns

to the defendant's general coffers.  So, although the $3 million is not added

to the $5 million fund used to satisfy claims of class members, it directly

benefits **future** class members.  ¶5, preliminary approval order, Bynum v.

Gov't of the Dist. of Columbia, 384 F. Supp. 2d 342.

The Settlement Agreement requires that all of the $5 million (minus

expenses) be distributed to class members who file claims, based on a point

system set forth in the proposed final order (Exhibit E to the Settlement

Agreement).  Settlement Agreement III, A , ¶6.  If some residual happens to

remain after reasonable efforts to distribute funds to class members who

have filed claims have been exhausted, the residual amount will revert to the

District of Columbia for use on the same programs and services that the $3

million is earmarked for;  that is, designing and building the Inmate

Processing Center.  Settlement Agreement page 13, Section III, A, ¶6.

The parties agreed that the $12 million Class Fund includes attorneys'

fees and costs.  Settlement Agreement III, A, ¶5.  The District agreed not to

object to Class Counsel's petition for 33.3% of the Class Fund, $4 million.

Id.   The parties agreed that, should the Court award less than the full

amount of the $4 million to the attorneys, the District of Columbia must

spend the remainder of the $4 million on the same programs and services

that the $3 million is earmarked for, that is, designing and building the

Inmate Processing Center.  Settlement Agreement page 13, Section III, A,

¶5.  That is, any amount in attorneys' fees the Court does not award to Class

Counsel inures to the benefit of the future class members, because the

District must spend the money to fund the injunctive relief changes

necessary to eliminate the overdetentions and strip searches that are the

subject of this lawsuit.

Additionally, as part of the Settlement Agreement, the District agreed

to change its policy of returning in-custody defendants entitled to release to

the DC Jail for out-processing (where they were strip searched).  As a result

of the Settlement Agreement, the District now diverts in-custody defendants

who go to court and receive a release order to an off site facility where they

are held while the Department of Corrections processes their releases in order to obviate the need for returning potential releasees to the DC Jail where they, along with all prisoners entering the jail, would be strip searched.  The Settlement Agreement does not assign a money value to this component of the settlement, and so Class Counsel are not claiming any of the value of this component of the Settlement Agreement as fees.

2.  ***Class Counsel's efforts were solely responsible for generating the $12 million Class Fund***

Class Counsel's efforts were solely responsible for generating the $12 million Class Fund.  The district court in <u>Swedish Hospital</u> applied several factors in assessing the attorneys' contribution to the fund in that case.  The Court of Appeals approved the use of those factors.  Applying those factors to this case shows the efforts of Class Counsel were solely responsible for generating the $12 million Class Fund: Plaintiffs' attorneys in this case were solely responsible for establishing the liability of the District and for generating the fund, unlike the attorneys' in Swedish who were piggybacking on the success of plaintiffs in prior litigation; plaintiffs' attorneys faced the risk of zero recovery because they were litigating as issues of first impression in this Circuit both (1) the reasonable amount of time the District has to release inmates after a judge at the courthouse orders his release, and also (2) the legality of subjecting court returns to strip

34

searches after a judge has ordered their release; the government never

acquiesced in the treatment of the dispute as a class action, and plaintiffs had

to litigate the certification issue twice; the class members were paupers or

low income persons, and this unable to pay counsel for their time in the very

likely event of no recovery; and Class Counsel exhibited extraordinary legal

skills in their representation.  Swedish Hospital Corp., 1 F.3d at 1265-1266

(factors considered by Court in assessing attorneys' contribution to the

fund).

3. ***Applying the common fund rules to the $12 million Class Fund mandates treatment as a common fund***

Section III, A, 1 of the Settlement Agreement obligates the District of

Columbia to pay a sum of $12 million into a Class Fund, and so the

settlement "generates" a common fund of $12 million attributable to the

efforts of Class Counsel.  Swedish Hosp. Corp., 1 F.3d at 1272.  Therefore,

the $12 million Class Fund qualifies as a common fund, Id., or as a

"constructive" common fund, In re Vitamins Antitrust Litig., 2001 U.S. Dist.

LEXIS 25067, *36.

a) **The Settlement Agreement generates a common fund of $12 million attributable to the efforts of Class Counsel**

Section III, A, 1 of the Settlement Agreement obligates the District of

Columbia to pay a sum of $12 million into a Class Fund, and so the

settlement "generates" a common fund of $12 million attributable to the

efforts of Class Counsel.  <u>Swedish Hosp. Corp.</u>, 1 F.3d at 1272.  Therefore,

the $12 million Class Fund qualifies as a common fund.  Id.

 In a pure common fund case, the attorneys' fees come from a fund

shared in common with class plaintiffs, and so the amount recovered by

plaintiffs is reduced by the amount awarded in attorneys' fees.  <u>In re</u>

<u>Vitamins Antitrust Litig.</u>, 2001 U.S. Dist. LEXIS 25067, 36.  Conversely,

amounts of the fund not awarded to class counsel increase the share of class

members.  This case is slightly different from the pure common find case

because: (1) the parties negotiated allocation of the fund between payment of

claims by past class members, and injunctive relief (in the nature of a cy

pres[15] fund) for the benefit of future class members, and (2) the District

---

[15] The term "cy pres" is derived from the Norman French expression cy pres comme possible, which means "as near as possible." The cy pres doctrine is a rule of construction used to preserve testamentary charitable gifts that otherwise would fail. When it becomes impossible to carry out the charitable gift as the testator intended, the doctrine allows the "next best" use of the funds to satisfy the testator's intent "as near as possible." <u>Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n</u>, 84 F.3d 451, 455 (D.C. Cir. 1996).  In the class action context, a cy pres beneficiary is designated to receive money for unidentifiable class members, or to receive unclaimed funds.  That doctrine permits such funds to be distributed to the "next best" class when the plaintiffs cannot be compensated individually. The object of applying the funds to the "next best" class is to parallel the intended use of the funds as nearly as possible by maximizing the number of plaintiffs compensated.  <u>Id</u>.

agreed not to challenge a fee petition that did not seek more than 33.3% of

the fund generated by the efforts of Class Counsel.  However, the attorneys'

fees still come from a fund shared in common with class plaintiffs, and any

amounts of the fund not awarded to Class Counsel increase the cy pres

portion of the fund allocated for improvements to the DC Jail that will

benefit future class members.  Thus, the fund established by the Settlement

Agreement retains the essential characteristics of a common fund because

(1) the District pays all the money into a common fund; (2) the Court

decides the percentage that will yield a reasonable fee; and (3) amounts of

the fund not awarded to Class Counsel go to increase the amount paid class

members, instead of returning to the general coffers of the District.

Bebchick v. Public Utils. Comm'n, 318 F.2d 187, 204 (D.C. Cir. 1963) (fund

consisting of revenues from improperly granted rate increase used to keep

fares down on behalf of current riders).

---

Pursuant to cy pres principles, class counsel in a class action establishing a
cy pres fund have an equitable interest in the cy pres fund as well as the
portion of the fund claimed by and distributed to identifiable class members,
and so the percentage-of-the-fund method is applied to cy pres funds.  Jones
v. National Distillers, 56 F. Supp. 2d 355, 360 (D.N.Y. 1999) (class counsel
have an equitable interest in unclaimed funds portion of a common fund
donated to a legal aid society pursuant to cy pres principles).

**b)** **The Settlement Agreement generates a "constructive" common fund of $12 million attributable to the efforts of Class Counsel**

Courts in this Circuit and other circuits have gone even farther in treating amounts paid by the defendant as a common fund for purposes of applying the common fund doctrine for determining attorneys' fees.  Courts in this Circuit and other circuits have aggregated into a "constructive" common fund all money paid by a defendant as a result of a class action settlement, even where the defendant pays attorneys' fees directly to class counsel (as opposed to paying all sums directly into a fund).

The $12 million fund generated by the Settlement Agreement qualifies as a "constructive" common fund under the principles laid down in In re Vitamins Antitrust Litig. and the cases cited therein to the extent it does not qualify as a pure common fund.

A "constructive common fund" is a fund generated by a class action settlement agreement treated as a class fund for purposes of both (1) determining whether to use the "percentage of the fund" method of computing a reasonable attorneys' fee (as opposed to the "lodestar" method); and also (2) determining the total value of the settlement to which the percentage is applied in computing a fee.  See e.g. In re Vitamins Antitrust Litig., 2001 U.S. Dist. LEXIS 25067, *36 (D.D.C. 2001).

The rationale for treating all amounts paid by the defendant as a result of a settlement as a common fund is that all amounts paid by the defendant represent a "package deal" best viewed as the class' recovery.  Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 246 (8th Cir. 1996).  For example, in Johnston, the settlement agreement provided for the defendant to make a separate payment of attorneys' fees to the class counsel.   The Court held that the defendant's paying the attorneys' fees directly to counsel, rather than those fees being deducted from a true common fund, did not change the character of the settlement as a common fund because:

> [although] under the terms of each settlement agreement, attorneys fees technically derive from the defendants rather than out of class recovery, in essence the entire settlement amount comes from the same source.  The award to the class and the agreement on attorney fees represent a package deal.  Even if the fees are paid directly to the attorneys, those fees are best still viewed as an aspect of the class' recovery.

Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 246 (8th Cir. 1996). Courts using this approach add the value of fees to plaintiffs' recovery for purposes of valuing the fund, combining the fee fund and the plaintiffs' fund, and then assess the reasonableness of the percentage by evaluating it as applied to the combined sums of amounts available for payment to plaintiffs, and the amount to be paid to class counsel.

District courts in this Circuit have applied the same analysis in cases where the value of the fund is readily calculable.  For example, Chief Judge Hogan held that it was appropriate to treat amounts generated by the settlement of an antitrust class action case as a "constructive common fund" even though attorneys' fees paid by defendants pursuant to a clear sailing provision, because the value of the fund was "readily calculable".  In re Vitamins Antitrust Litig., 2001 U.S. Dist. LEXIS 25067, 40-41.  In a true common fund case, the attorneys' fees would be taken from a fund shared in common with class plaintiffs; therefore, the amount recovered by plaintiffs is reduced by the amount awarded in attorneys' fees, and conversely, amounts not awarded to attorneys increase the plaintiffs' share of the fund. 2001 U.S. Dist. LEXIS 25067, 36.  Chief Judge Hogan specifically held that the separate payment of fees by the defendant did not bar the application of the common fund doctrine, in large part because the value of the fund was "readily calculable."  2001 U.S. Dist. LEXIS 25067, 45.  Chief Judge Hogan held that the proper approach was to add the value of fees to plaintiffs' recovery for purposes of valuing the fund, and then apply the reasonable percentage to the combined amounts available for payment to plaintiffs, and the amount to be paid to class counsel.  2001 U.S. Dist. LEXIS 25067, 55. Chief Judge Hogan ruled that the attorneys' fees should be characterized as

part of the common fund because they are a valuable part of the settlement.

2001 U.S. Dist. LEXIS 25067, 55, <u>citing</u> <u>Johnston</u>, 83 F.3d at 246

(attorneys' fees paid directly to plaintiffs are nonetheless part of the common

fund because the payment of the fees and the plaintiffs' share is part of a

"package deal") and <u>In re GMC Pick-Up Truck Fuel Tank Prods. Liab.</u>

<u>Litig.</u>, 55 F.3d 768, 802 (3d Cir. 1995) (noting that the first edition of the

Manual for Complex Litigation provided that fees "paid by the defendant(s)

are properly part of the settlement funds").

## VII.  CLASS COUNSEL IS ENTITLED TO THE DISTRICT OF COLUMBIA CIRCUIT'S BENCHMARK OF 33.3% OF THE COMMON FUND

Thirty-three and one-third percent (33.3%) of the value of the Class

Fund is a reasonable fee for class counsel because that percentage is within

the bench mark used in this Court for the percentage of the fund method, and

because an analysis of the other factors district courts in this Circuit and

other courts consider in determining the reasonableness of a percentage used

in a common fund case support this figure.

### 1.  *Standard of Review*

In general, a trial court enjoys substantial discretion in making

reasonable fee determinations, because that discretion is premised upon the

district court's "superior understanding of the litigation and the desirability

of avoiding frequent appellate review of what essentially are factual

matters." Swedish Hosp., 1 F.3d at 1271.

> 2.    ***The Thirty-Three and One-Third Percent Figure is well within the range of reasonable fees in common fund cases***

The 33.3% figure is well within the range of reasonable fees in

common fund cases.  In 1993, the Court of Appeals arrived at a 20% to 30%

range based on "a review of similar cases." Swedish Hosp. Corp., 1 F.3d at

1272. Swedish Hosp. was decided almost 15 years ago.  A review of **recent**

similar cases reveals that a majority of common fund class action fee awards

now fall between thirty and thirty four percent.  Swedish Hosp., 1 F.3d at

1272.  Recent cases from this Court applying the percentage-of-the-fund

method and the percentage the Courts found reasonable include: In re

Vitamins Antitrust Litig., 2001 U.S. Dist. LEXIS 25067, 36 (D.D.C. 2001)

(Court awarded approximately 34% of a settlement fund calculated to be

approximately $ 360 million); In re Baan Co. Secs. Litig., 288 F. Supp. 2d

14, 21 (D.D.C. 2003)(reducing counsel's requested fees from 32% to 28%

because of problems in counsel's performance); In re Lorazepam &

Clorazepate Anittrust Litig., 2003 U.S. Dist. LEXIS 12344 (D.D.C.

2003)(award of 30% of the common fund in attorneys' fees is appropriate);

In re Baan Co. Secs. Litig., 288 F. Supp. 2d 14, 19 (D.D.C. 2003)(awarding

requested percentage award of 32%); <u>In re First Databank Antitrust Litig.</u>,

209 F. Supp. 2d 96, 101 (D.D.C. 2002)(Court awards class counsel for the

direct purchaser settlement class a fee calculated at thirty percent (30%) of

the $ 8 million attributable to their efforts, or $ 2.4 million, reduced because

counsel "piggy-backed" on previous litigation).  One district court in this

Court awarded 45% of the settlement fund of $ 7.3 million for a total fee of

$ 3,285,000.00 in one pre- <u>Swedish Hosp.</u> case.  <u>In re Ampicillin Antitrust</u>

<u>Litigation</u>, 526 F. Supp. 494, 499 (D.D.C. 1981)(Judge Richy).

Common fund awards of 33% or more exist in numerous settings.

The cases are far too legion to cite where, under less compelling

circumstances, 33% or more of the Class' recovery has been awarded to

Class Counsel in other jurisdictions. <u>E.g.</u>, <u>Pacific Enterprises Securities</u>

<u>Litigation</u>, 47 F.3d 373, 379 (9th Cir. 1995)(33.3% award upheld because of

"the complexity of the issues and the risks"); <u>In Re Merry-Go-Round</u>

<u>Enterprises, Inc.</u>, 244 B.R. 327, 339-340 (2000)(where case was "complex"

and results "spectacular," "the high risks involved in this representation

support the reasonableness of the [40%] contingent fee"); <u>In Re Combustion,</u>

<u>Inc.</u>, 968 F.Supp. 1116, 1135-1136 (W.D. La. 1997)(36% award where

among many factors, the court noted that results obtained were "excellent");

<u>In Re Shell Oil Refinery</u> (E.D. La. 1993) 155 F.R.D. 552. 568 ff (33 1/3% of

170 million dollars awarded where, among other things, the court

characterized the results obtained as "excellent"); <u>Wise v. Popoff</u>, 835

F.Supp. 977, 980, 982 (E.D. Mich. 1993)(45.3% of the fund awarded; "fee

awards in common fund cases generally are calculated as a percentage of the

fund created, with the percentages awarded typically ranging from 20 to 50

percent of the common fund created" ).[16]

    The <u>Swedish Hosp.</u> Court also held that the district court was within

its discretion in basing its fee calculation only on "that part of the fund for

which counsel was responsible [for generating]."  1 F.3d at 1272.  Here,

Class Counsel is responsible for generating the entire $12 million Class

Fund.  The "reversionary fund" will be for new programs or activities not

previously budgeted (and specifically not as a part of the general budget).  In

a recent case, the Court of Appeals approved the district court's taking

---

[16] <u>See</u> <u>also</u> Willging, Hooper & Niemic, <u>Empirical Study of Class Actions in</u>
<u>Four Federal District Courts: Final Report to the Advisory Committee on</u>
<u>Civil Rules</u>, Federal Judicial Center (1996), pp. 68-70 (most class actions
where a fund was created used the percentage of the fund method to award
fees; the range was 20% to 40%, with the median percentage ranging from
27% to 30%; only "infrequently" did the award exceed the "traditional
33.3% contingent fee rate"); Silber and Goodrich, "Common Funds and
Common Problems: Fee Objections and Class Counsel's Response", 17 Rev
Litig. 525 (1998)(concluding that class fund attorney's fees should be based
on the percentage of the fund and should reflect the contingent fee market, in
which one-third of the recovery as attorneys' fees are standard).

"great pains to account for any benefit that the services of petitioners' attorneys may have conferred on the Riders' Fund and award[ing] these attorneys a reasonable percentage of the funds produced through their efforts." Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n, 38 F.3d 603, 608 (D.C. Cir. 1994).

The settled case to date most analogous to this case, Williams v. County of Los Angeles, CV 97-03826-CW, which involved a $27 Million settlement, a portion of which went to Sheriff's and other at risk programs, and which also resulted in procedures to eliminate over-detentions and strip searches after court ordered release. One of the class counsel here – Barrett S. Litt – was lead counsel in that case. The fees awarded in that case were structured differently in that $5.5 Million was paid in attorneys' fees for the injunctive relief component of the case, and 20% of the remaining fund of $21.5 Million was ultimately awarded as class fund attorneys' fees. The court aggregated the total to address the reasonableness of the fee award (which aggregate was $27 Million) and concluded that the combined fee award amounted to 35.47% of the total settlement of $27 Million, which it considered reasonable given the hard fought nature of the litigation, the exceptional results, and the skill and expertise of plaintiffs' counsel. See Exhibit (copy of Williams fee order)

### 3.      *Other factors weigh in favor of making 33.3% reasonable under the circumstances of this case*

While this Circuit has not yet developed a formal list of factors to be considered in evaluating fee requests under the percentage-of-recovery method, courts in other jurisdictions, and district courts in this Circuit, have delineated factors that courts should consider in evaluating fee requests.  In re Lorazepam & Clorazepate Anittrust Litig., 2003 U.S. Dist. LEXIS 12344 (D.D.C. 2003).

These factors weigh in favor of making 33.3% reasonable under the circumstances of this case.

Courts have looked to several factors in assessing the reasonableness of a fee request, including: (1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. In re Lorazepam & Clorazepate Antitrust Litig., 2003 U.S. Dist. LEXIS 12344, at 27; In re Baan Co. Secs. Litig., 288 F. Supp. 2d 14, 17 (D.D.C. 2003).  Applying these factors to this case supports an award at the higher range.

(1) <u>Size of the fund created and the number of persons benefited</u>.  The

Settlement Agreement achieved the highest known settlement payment by

the District of Columbia up to this time.  The fund will be distributed among

many thousands of class members.  The $3 million to fund injunctive relief

will benefit thousands of future class members.

(2) <u>Presence or absence of substantial objections by members of the</u>

<u>class to the settlement terms and/or fees requested by counsel</u>.  Since the

time for objections has not run, plaintiffs cannot address this factor at this

time. The court will be in a position to consider it by the time of the Final

Approval Hearing.

(3) <u>Skill and efficiency of the attorneys involved</u>.  Class Counsel are

highly skilled and experienced, and conducted the litigation in a professional

manner. Opposing counsel Leonard Becker, Maria Amato and Richard Love

are also highly skilled and experienced.  Magistrate Judge Carla M. Woehrle

in describing Barry Litt in ¶6 of the fee award in <u>Williams</u> stated, "Barry Litt

is considered one of the outstanding civil rights litigators in California, with

special expertise in class actions. "  The order describes the difficulty and

complexity of the Williams case, and the skill, experience, and persistence

Mr. Litt applied to the case.  William Claiborne has litigated numerous civil

rights cases in this Court against the District of Columbia Metropolitan

Police Department and the Department of Corrections.  William Claiborne has litigated numerous criminal cases in the District of Columbia Superior Court that gave him extensive knowledge of the criminal justice system in the District of Columbia, and made him uniquely qualified to handle this case.  Mr. Cunningham also has extensive experience litigating against the District of Columbia, and has participated in some of the most important structural reform class action cases in the District of Columbia.

Mr. Litt and Mr. Claiborne have a national civil rights class action practice focusing on overdetentions and strip search issues in local jails. Other pending civil rights class action cases in which they are co-counsel include: <u>Johnson v. District of Columbia</u>, 02-2346 (RMC)(challenging US Marshalls' practice of subjecting women, but not men, arrestees brought to the District of Columbia District Court for presentments to strip searches); <u>Powell v. Barrett</u>, 04-1100 (RSW)(challenging overdetentions and illegal strip searches in the Fulton County Jail), N. D. Ga.; <u>Jones v. Murphy</u>, CCB 05 CV 1287 (D. Maryland)( challenging overdetentions and illegal strip searches in Central Booking in Baltimore, MD); <u>Holloway v. District of Columbia</u>, 05-1502 (RCL)(challenging Department of Corrections' practice of holding inmates in DC Jail and CTF after a judicial officer has ordered their placement in a halfway house).

48

Mr. Claiborne is a CLE speaker on overdetentions and strip searches at the Annual Litigation under 42 U. S.C. Section 1983 Skills, in Atlanta, Georgia on December 9, 2005 (http://www.iclega.org/programs/6191.html). Mr. Litt has published in the area.  Mr. Cunningham is a Professor Emeritus of Clinical Law, The George Washington University Law School.  In addition to Class Counsel, Cunningham's skills and expertise as a federal court litigator brings to the Bynum case extensive knowledge and experience with the District of Columbia government, and with the issues confronting the plaintiff class.  Counsel have attached affidavits detailing their qualifications.

(4) <u>Complexity and duration of the litigation</u>.  The complexity and duration of the litigation is detailed above in Section V above.  The Settlement Agreement was the culmination of over 4 years of effort, 2 years of intense litigation, and almost two years[17] of equally intensive mediation. Although the parties ultimately decided to mediate the case, and to work together to reach a fair and far-reaching settlement, at the beginning, the District fiercely litigated practically every issue as evidenced by the multiple motions and depositions prior to settlement.  Moreover, Class Counsel

---

[17] The Court referred the case for mediation on May 5, 2004 (docket # 114). The parties advised the Court of a settlement in principle at a hearing on May 13, 2005.

expended many hours during the mediation period preparing for the mediation, preparing dispositive motions, and preparing for trial.

Class Counsel and their staff will also have to spend about 200 hours after submission of the petition in administering the settlement.

(5) Risk of nonpayment.  Plaintiffs in this case had no resources with which to pay attorneys' fees.  No plaintiff committed to pay any fee in the event of defeat.  Each person who executed a retainer with Class Counsel agreed to allow Class Counsel's fees to be paid out of any fund generated by the efforts of Class Counsel.

(6) Amount of time devoted to the case by plaintiffs' counsel.  The complex legal and factual issues in the case required Class Counsel and support staff to expend extensive time and effort.  The case required counsel to conduct in-depth investigations, interview and depose witnesses, retain experts, and defend against motions to dismiss, motion for summary judgment, and fierce opposition to certification and discovery.

Class Counsel expended over 3,351 attorney hours, law student time was 248.6 hours, paralegal and staff expended over 225.5 hours.  Class Counsel and their staff will also have to spend about 50 hours each after submission of the petition administering the settlement.

(7) <u>Awards in similar cases</u>.  Plaintiffs detailed awards in similar cases above. One third is within the range of what is customarily awarded. Chief Judge Hogan in <u>Vitamins Antitrust Litig.</u>, 2001 U.S. Dist. LEXIS 25067, 36 (D.D.C. 2001) found that the presence of the following factors warranted the higher fee award of 34%: exceptional benefits to a large class as grounds for a higher fee award; experience, skill and professionalism of counsel and the performance and quality of opposing counsel; the litigation was "far ahead of public agencies . . . which long after the institution of this litigation awakened to the concerns that plaintiffs' counsel first identified;" extensive time and effort exerted by the attorneys and the existence of complex legal and factual.  These factors are present in this case. In addition, the percentage fee awarded in the very similar <u>Williams</u> case exceeded one third.

In 2004, Judge Michael Rankin of the District of Columbia Superior Court awarded William Claiborne and Sean Day 33% of a common fund of about $110,000 in the case of <u>Elliott v. Smart Professional Photocopy Corp.</u>, 02ca3321 (MR).

4. ***Litigating Against The District***

A significant fact in evaluating the reasonableness of plaintiffs' proposed fee award is that, until plaintiffs filed their lawsuit in May 2002, no

other individual, law firm or public interest group had filed a lawsuit

challenging the overdetentions and strip searches stemming from the

Records Office problems.  In fact, during the period in question, only 4

outside agents were working informally to help secure the release of

overdetained inmates from Department of Corrections' custody: the Office

of the Chief Judge of the District of Columbia, the District of Columbia

Superior Court Public Defender's Office, D.C. Prisoners' Legal Services

Project, and, last but not least, the court appointed lawyers[18] representing

indigent defendants in the Superior Court.  Plaintiffs' case was the first

lawsuit filed seeking class wide damages for overdetentions and strip

searches, or systemic change through court ordered injunctive relief.

One explanation for this is the well known difficulties of litigating

against the District, which in the past has often been unwilling to resolve or

expedite cases challenging its policies and practices.  As it turned out, the

District ultimately approached the issue of resolving the case constructively.

---

[18] Class Counsel Claiborne is well acquainted with many members of the
criminal defense bar practicing in the District of Columbia Superior Court,
and almost every one has a horror story to tell about trying to prod the
Records Office to release an inmate whom a judge has ordered released.
The members of the criminal defense bar practicing in the District of
Columbia Superior Court, assisted by the Chief Judge's Office, have been
the first and only go to resource for family members and loved ones trying to
secure the release on overdetained inmates.

However, seen from the perspective of Class Counsel and other lawyers in 2002 and in previous years, before the filing of the lawsuit, the litigation tactics of the Department of Corrections in the <u>Neal</u> case served as a warning -- and as a deterrent -- to lawyers contemplating bringing damage suits against the Department of Corrections.  <u>See Neal v. Director, D.C. Dep't of Corrections</u>, 1996 U.S. Dist. LEXIS 8874 (D.D.C. 1996)(summarizing problems District of Columbia caused in litigating case).  Thus, Class Counsel accepted the burdens of this case from the perspective that they would face the same difficulties as were reflected in <u>Neal</u>.

## 5. *Lodestar cross-check analysis*

Moreover, although neither <u>Swedish Hospital</u> nor the district courts applying it have ever applied a lodestar cross-check analysis, a lodestar cross-check analysis in this case supports plaintiffs' request.  Courts that encourage the use of a lodestar cross-check in evaluating the reasonableness of the percentage-of-the-fund fee usually use multipliers.  <u>See In re Visa Check/Mastermoney Antitrust Litig.</u>, 297 F. Supp. 2d 503, 521 (D.N.Y. 2003)(discussing use of multipliers in lodestar cross-checks in the 2d Circuit).  Newburg and Conte also encourage the use of multipliers in lodestar cross-checks, noting that "Multiples ranging from one to four

frequently are awarded in common fund cases when the lodestar method is

applied.  Newberg on Class Actions 4th, 14:6, pg. 578.

Numerous courts have recognized that extraordinary recoveries

should result in greater multipliers:

| CASE NAME, NUMBER AND COURT | MULTIPLER |
|---|---|
| In re Rite Aid Corp. Sec. Litig., 146 F. Supp. 2d 706 (E.D. Pa. 2001) | 10.73 |
| Cosgrove v. Sullivan, 759 F. Supp. 166 (S.D.N.Y. 1991) | 7 74 |
| Roberts v. Texaco, Inc., 979 F. Supp. 185 S.D.N.Y. 1997) | 5.5 |
| In re Waste Mgmt., Inc., Sec. Litig., MDL 1422, Civil Action No. H-01-4381, 2002 U.S. Dist. LEXIS 3460 (S.D. Tex. Jan. 17, 2002) | 5.29 |
| In re Cendant Corp. PRIDES Litig., 243 F.3d 722 (3d Cir. 2001) | 5 28 |
| Kuhnlein v. Dep 't of Revenue, 662 So. 2d 309 (Fla. 1995) | 5.0 |
| In re Beverly Hills Fire Litig., 639 F. Supp. 915, 924 (E.D. Ky. 1986) | 5.0 |
| In re Cenco, Inc. Sec. Litig., 519 F. Supp. 322, 327 (N.D. Ill. 1981) | 4.0 |
| Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1051 (9th Cir. 2002) | 3.65 |

Moreover, the early resolution of this case, prior to trial or contested

motions for summary judgment, adds to the class's benefit. It is the well-

established practice of courts to award higher multipliers in cases that settle

early, and in which counsel have incurred only modest attorneys' fees. In re

Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 523 n.29, 524 (E.D.N.Y. 2003) (approving 3.5 multiplier); In re NASDAQ Mkt.-Makers Antitrust Litig., 187 F.R.D. 465 (S.D.N.Y. 1998) (approving a multiplier of 3.97).

Class Counsel expended over 3,351 attorney hours, law student time was 248.6 hours at $136, for a total of $33,809.60, paralegal and staff expended 225.5 hours for a total of $29,490.00. Class Counsel and their staff will also have to spend about 50 hours each after submission of the petition administering the settlement.

The following chart shows time expended for each category of person, the person's hourly rate, number of the person hours billed, and totals.

| Atty | Hourly rate | Number of hours | Dollar amount |
|------|-------------|-----------------|---------------|
| Barrett S. Litt | $600.00 | 288.3 | 172,980.00 |
| Paula Daniels | $600.00 | 0.5 | $300.00 |
| Paul Estuar | $500.00 | 128 | $64,000.00 |
| Bryan Miller | $500.00 | 1.4 | $700.00 |
| Delia Ibarra | $250.00 | 62.8 | $15,700 |
| *Sub total* | | *481.10* | *$253,680.00* |
| William Claiborne | $600 | 2,442.4 | |
| *Sub total* | | | *$1,465,440.00* |
| Lynn Cunningham | $600 | 470 | |
| *Sub total* | | | *$282,000* |
| **Total for attorneys** | | **3,393.4** | **$2,001,120** |

| PARALEGAL/ ASS'T PARALEGAL TIME [Litt, Estuar] | Hourly rate | Number of hours | Dollar amount |
|---|---|---|---|
| Heath White | $150.00 | 10.6 | $1,590.00 |
| Rachel Sacramento | $150.00 | 1.4 | $210.00 |
| Mayling Kao | $140.00 | 0.1 | $14.00 |
| Kelly Snitkin | $130.00 | 15.5 | $2,015.00 |
| Dannete Wilkerson | $130.00 | 0.4 | $52.00 |
| Adhali Arevalo | $110.00 | 67.2 | $7,392.00 |
| Julia White | $175.00 | 84.4 | $14,770.00 |
| Norma Herrera | $90.00 | 29.1 | $2,619.00 |
| Mychel Wills | $60.00 | 13.8 | $828.00 |
| **Total** | | **225.5** | **$29,490.** |

In addition, Mr. Claiborne employed law clerks and staff with a total billing value of $$33,809.60. Below is a summary chart showing the final total to date.

| CATEGORY | TOTAL |
|---|---|
| Litt, Estuar Attorneys | $253,680.00 |
| William C. Claiborne | $1,465,440.00 |
| Lynn Cunningham | $282,000.00 |
| Litt, Estuar Non-Attorneys | $29,490.00 |
| Claiborne Non-Attorneys | $33,809.60 |
| **Total** | **$2,064,419.60** |

At the <u>Laffey</u>[19] matrix rate, actual class counsel time amounts to

**$2,001,120**.  At the <u>Laffey</u> matrix rate, actual paralegal/ staff and law

---

[19] Class Counsel use the <u>Laffey</u> matrix as adjusted for inflation using the nation-wide Legal Services Component of the Consumer Price Index

student time is $63,299.60.  The combined total for attorney time and

paralegal, law student time is **$2,064,419.60**.

A multiplier of just 2 produces a fee of **$4,128,839.20.**

Projected paralegal/ staff time after submission of the petition for

administering the settlement is about 50 hours, for a total of approximately

$5,000.  Projected Class Counsel time after submission of the petition for

administering the settlement is about 50 hours, for a total of approximately

$30,000.00.

Class Counsel employ the <u>Laffey</u> matrix as adjusted for inflation

using the nation-wide Legal Services Component of the Consumer Price

Index produced by the Bureau of Labor Statistics of the United States

Department of Labor.  The methodology of calculation and benchmarking

for this Updated <u>Laffey</u> Matrix has been approved in a number of cases.  <u>See</u>

<u>e.g.</u>, <u>McDowell v. District of Columbia</u>, Civ. A. No. 00-594 (RCL),

LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); <u>Salazar v.</u>

---

produced by the Bureau of Labor Statistics of the United States Department
of Labor.  The methodology of calculation and benchmarking for this
Updated <u>Laffey</u> Matrix has been approved in a number of cases.  <u>See</u> <u>e.g.</u>,
<u>McDowell v. District of Columbia</u>, Civ. A. No. 00-594 (RCL), LEXSEE
2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); <u>Salazar v. District of</u>
<u>Columbia</u>, 123 F.Supp.2d 8 (D.D.C. 2000).  <u>See</u>
http://justiceintheworkplace.com/matrix.html.

<u>District of Columbia</u>, 123 F.Supp.2d 8 (D.D.C. 2000).  <u>See</u>

http://justiceintheworkplace.com/matrix.html.

      Class Counsel depart from the Laffey matrix in two instances.  Class

Counsel believe that William Claiborne's time should be billed at $600

instead of $497, even though he is technically in the 11-19 years out of law

school range.  Mr. Claiborne specializes in civil rights class actions, he

played the largest role in moving the case forward, and he is only one year

away from the top <u>Laffey</u> rate.  Class Counsel value Ms. White's hourly rate

at $175 per hour because she is a senior paralegal with many years of civil

rights class action experience.

VIII.   <u>CLASS COUNSEL ARE ENTITELD TO REASONABLE
       EXPENSES IN THE AMOUNT OF $87,216.62</u>

      The list below contains the costs incurred in the case. (This list does

not include any costs associated with the Class Administrator, which are

handled separately under the settlement agreement.) Litt Estuar was

responsible for the costs, and this list is inclusive of costs incurred by Mr.

Claiborne. As with time, all costs are entered into the Litt Estuar billing

system coded to the case, and this list is taken from that program,

supplemented by information provided by Mr. Claiborne. In house copying,

scanning and printing are put together as current technology uses the same

equipment for both.

| Item | Amount |
|---|---|
| In house copying/ printing/ scanning | $941.76 |
| Outside copying | $1070.97 |
| Fax | $27.00 |
| Phone | $324.15 |
| Research | $538.05 |
| Delivery | $959.52 |
| Postage | $19.63 |
| Travel | $751.20 |
| Meals | $160.28 |
| Court Fees | $663.00 |
| Deposition Transcripts | $16,216.31 |
| Court Transcript | $182.50 |
| Expert Fees | $61,802.50 |
| Expert Costs [Phone & Travel] | $1747.75 |
| Investigators | $1,027.00 |
| Computer Support | $732.00 |
| Parking | $53.00 |
| **Total** | **$87,216.62** |

| Respectfully submitted, | Respectfully submitted, | Respectfully submitted, |
|---|---|---|
| _____ | _____ | _____ |
| William Claiborne | Barrett S. Litt | Lynn E. Cunningham |
| DC Bar # 446579 | Pro hac vice | DC Bar # 221598 |
| 717 D Street, N.W., Suite 210 | Litt, Estuar et al. | 306 Westview Drive |
| Washington, D.C. 20004 | 1055 Wilshire Boulevard, Suite 1880 | P.O. Box 1547 |
| Ph: 202-824-0700 | Los Angeles, CA 90010 | Dubois, Wyoming 82513 |
| Fax: 202-824-0745 | Ph: 213-386-3114x217 | Ph: 307-455-3334 |
| Class Counsel | Class Counsel | Class Counsel |